UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

Darrell J. Bolden,                                   :
                                                     :
                        Plaintiff,                   :
                                                     :          **MEMORANDUM & ORDER**
            -against-                                 :
                                                     :          05-CV-4914 (DLI)
Commissioner of Social Security,[1]                  :
                                                     :
                        Defendant.                   :

-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Darrell Bolden filed an application for disability insurance benefits under the Social Security Act (the "Act") on November 21, 2000, alleging a continuous disability beginning October 1, 1992. Plaintiff's application was denied initially and upon reconsideration. Plaintiff requested an administrative hearing on November 26, 2001. This request was granted and a hearing was held before an Administrative Law Judge ("ALJ") on February 18, 2004. By decision dated May 25, 2004, the ALJ concluded plaintiff was disabled within the meaning of the Act, but had not been under the disability from June 25, 2000 through September 1, 2003 ("the disputed period"). On September 23, 2005, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

Plaintiff brought the instant action to challenge the portion of the Commissioner's decision finding him "not disabled" during the disputed period. Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming his determination that plaintiff

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

1

was not disabled during the disputed period because he possessed the residual functional capacity to perform his past relevant work. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of this portion of the Commissioner's decision, or alternatively, to remand. For the reasons stated below, both the plaintiff's and the commissioner's motion for judgment on the pleadings are denied and the court remands this case to the Commissioner for further proceedings.

## I.    Summary of Facts

*Plaintiff's Benefits Application and Testimony*

Plaintiff was born on September 13, 1948 and completed high school and three years of college before serving in the military during the Vietnam War. (Admin. R. at 48-49, 107.) On July 10, 1969, while stationed in Vietnam, plaintiff was seriously injured after suffering a gunshot wound to the head. (*Id*. at 50.) Approximately two years later, plaintiff began experiencing seizures "off and on." (*Id*. at 50.) Plaintiff's seizures worsened "over the years" and on June 9, 1993, he applied for disability insurance benefits. (*Id*. at 50, 91.) After this application was denied initially and upon reconsideration, plaintiff obtained a hearing in front of an ALJ. (*Id*. at 91.) In a decision dated August 25, 1994, the ALJ found that plaintiff suffered from "severe post traumatic stress disorder, a major thought disorder, dysthymia[,] and a seizure disorder" and was entitled to disability insurance benefits for a period of disability beginning on October 1, 1992. (*Id*. at 94.)

In 1995, plaintiff moved from New York to South Carolina. (*Id*. at 59.) While in South Carolina, plaintiff worked at Frigidaire, assisting in refrigerator assembly, and at Orion Rugs packing rugs into boxes for shipping. (*Id*. at 58, 107.) Although he could not remember the exact dates, plaintiff reported working at Frigidaire for approximately four months and at Orion Rugs for approximately six months between 1997 to 1999. (*Id*. at 58-59, 107, 159.) On September 24, 1998,

the Commissioner notified plaintiff that his benefits would be terminated in November of that year. (*Id*. at 106). After a hearing, an ALJ upheld the termination of plaintiff's benefits in a decision dated June 24, 2000. (*Id*. at 103-14.) Specifically, the ALJ found that plaintiff was no longer disabled within the meaning of the Act because he had "the residual functional capacity to perform a significant range of light work." (*Id*. at 113.) On November 21, 2000, plaintiff filed the application to reinstate his disability insurance benefits that is the subject of the present action. (*Id*. at 131-44.)

At the February 18, 2004 hearing, plaintiff testified that, after losing his benefits, he worked from August of 2000 through October 31, 2000 as a plumber's helper until his employer fired him because he had a seizure on the job. (*Id*. at 68.) Plaintiff testified that he subsequently worked part-time as a stock clerk at a "Little General" grocery store in Belton, South Carolina for approximately one year in 2001. (*Id*. at 69.) Plaintiff lost this job after his manager observed him go into a seizure while stocking a cooler. (*Id*. at 57, 70.) Plaintiff has not worked since losing his position as a stock clerk and, in December of 2002, he moved to New York to live with his sister. (*Id*. at 56, 59.) In summarizing his work history both prior to and during the period at issue, plaintiff stated that he lost "27 jobs in 30 years . . . because of the seizures" and that during the past fifteen years he had worked as a textile manager, a grocery manager, a cook, a plumber's helper, a stock clerk, and a painter's helper. (*Id*. at 56, 69.)

In discussing his condition at the time of the February 18, 2004 hearing, plaintiff testified that his seizures occur at least once every week and that his most recent seizure occurred the day before the hearing. (*Id*. at 51.) Plaintiff reported taking 600 milligrams of Dilantin per day, which "doesn't stop the seizures, just keep[s] them under control" by decreasing their frequency and severity. (*Id*. at 51-52.) Plaintiff also testified that he suffers from post-traumatic stress disorders stemming from

his experiences in Vietnam, which causes him to "snap at people without even realizing it" and to "go off by himself" and that he has a very difficult time handling "any kind of loud noises, firecrackers, guns going off[,] and cars backfiring" when he is outside. (*Id*. at 54, 60-61.)

According to plaintiff, he has not driven a car since 2000 when one of his doctors in South Carolina instructed him not to. (*Id*. at 73.) Plaintiff stated he was able to take public buses and trains in order to visit his doctors and that he walks four blocks to church several times a week for services and Bible study. (*Id*. at 71-72.) Plaintiff also indicated he occasionally traveled greater distances with his church group to attend conferences. (*Id*. at 62-63.) Plaintiff testified that he cleans his own room, goes shopping with his sister, and is able to cook but that his sister normally does most of the cooking. (*Id*. at 62.) Plaintiff claimed to avoid standing or sitting for more than ten to fifteen minutes, walking for more than three or four blocks, or lifting more than twelve pounds because he fears the exertion will trigger a seizure. (*Id*. at 64, 74.)

In addition to plaintiff's testimony, the ALJ also elicited testimony at the February 18, 2004 hearing from Miriam Greene, a vocational expert. (*Id*. at 79-85.) Ms. Greene testified that an individual with no exertional limitations but who could not work at heights, be exposed to dangerous machinery, or work in a loud, noisy environment could still perform plaintiff's past relevant work as an assembler, a packer, and a stock clerk. (*Id*. at 81.) When the ALJ added the limitation of being unable to lift more than twelve pounds, Ms. Greene testified that such an individual could not work as a stock clerk, but could do light packing or light assembly work and that about 200,000 such jobs exist in the national economy. (*Id*. at 82-83.) Ms. Greene further testified that an individual with the aforementioned environmental limitations, no exertional limitations, and moderate limitations on the ability to interact socially would still be able to perform plaintiff's past relevant work as an

assembler, packer, or stock clerk; but an individual with major impairments in several areas—such as school, family relations, judgment, thinking, and mood—would not be able to perform any of plaintiff's past relevant work. (*Id*. at 84-85.)

*Medical Evidence*

1. <u>Evidence prior to the Disputed Period.</u>

Plaintiff received medical treatment at Veteran's Administration medical centers in Greenwood, South Carolina ("the South Carolina VA"); New York, New York ("the Manhattan VA"); and Brooklyn, New York ("the Brooklyn VA"). Dr. John Davis, a psychiatrist, began treating plaintiff at the South Carolina VA on April 12, 1999. (Admin. R. at 392-93.) Plaintiff complained to Dr. Davis about having seizures caused by a gunshot wound to the head that plaintiff suffered in Vietnam. (*Id*. at 393.) Plaintiff stated that Dilantin controlled his seizures, but that he had been out of the prescription for two months. (*Id*.) Plaintiff claimed he worked forty hours per week on the night shift and slept only four to five hours per day. (*Id*.) Plaintiff complained of fatigue and some paranoia and hallucinations. (*Id*.) Plaintiff described a history of nightmares and poor sleep but stated his condition had improved in recent years. (*Id*.) Dr. Davis's notes indicate that plaintiff's electroencephalography ("EEG") revealed abnormalities. (Admin. R. at 393.) Dr. Davis diagnosed plaintiff with grand mal seizure disorder, post-traumatic stress disorder, and hypertension and prescribed plaintiff Dilantin and folic acid. (*Id*. at 392.)

Dr. Davis's clinic notes from July 8, 1999 indicate that plaintiff had not taken his Dilantin for one to two weeks, had been having seizures, and had been unable to work. (*Id*. at 390.) Plaintiff also complained of nausea and reported that his old doctor had instructed him not to mix his Dilantin with other medications. (*Id*.) Dr. Davis again prescribed plaintiff Dilantin. (*Id*.) Notes from August

13, 1999 indicate plaintiff visited Dr. Davis again and complained about feeling discriminated against because of his race on account of the level of service-connected disability payments he was receiving. (*Id*. at 389.) Dr. Davis noted an angry and anxious mood and directed plaintiff to take Dilantin regularly and told plaintiff to call if he experienced difficulty tolerating his medication so that they could try alternative prescriptions. (*Id*.) Dr. Davis also recommended counseling and personality testing. (*Id*.)

On October 12, 1999, upon the request of Dr. Davis, plaintiff visited Dr. Richard Fessler. (*Id*. at 365.) Dr. Fessler noted that although plaintiff claimed to be taking his medication, his charts indicated a Dilantin level below .05 in August, 1999. (*Id*.) Dr. Fessler diagnosed plaintiff with seizure disorder, instructed him not to drive, and directed him to continue taking Dilantin. (*Id*. at 365-67.) On October 28, 1999, Dr. Davis saw plaintiff again, accompanied by his wife, and spoke with them about problems in their marriage. (*Id*. at 388.) During this visit, the couple discussed plaintiff's problems with anger management and Dr. Davis recommended plaintiff seek in-patient treatment for his post-traumatic stress disorder and referred the couple to a social worker, Ruth Beddingfield. (*Id*.) Shortly thereafter, on November 8, November 22, and December 6, 1999, Ms. Beddingfield spoke with plaintiff and his wife at the South Carolina VA about their marriage and plaintiff's individual problems stemming from his medical condition. (*Id*. at 362-64). Ms. Beddingfield noted plaintiff was irritable and depressed and she recommended the couple continue to seek counseling. (*Id*. at 362.) On December 7, 1999, plaintiff saw Dr. Davis again and reported having suffered two seizures on December 5, 1999. (*Id*. at 378.) Plaintiff could not remember the seizures but his wife observed them and stated he had been in a daze and trembling. (*Id*.) Dr. Davis noted that plaintiff was calmer, less angry, and "more philosophical" than usual. (*Id*.) Dr. Davis also

reported that plaintiff's Dilantin levels were less than .05; he was not taking the Dilantin as often as he used to; and that his seizures kept him from driving except in emergencies. (*Id*.) Dr. Davis prescribed daily doses of Klonopin for plaintiff's tension and seizures and directed plaintiff to continue to take his Dilantin and folic acid. (*Id*.)

On January 25, 2000, plaintiff made an unscheduled visit to the South Carolina VA for an unrelated medical concern. (*Id*. at 361-62.) The clinic notes from that visit indicate that he had a seizure two days prior on January 23, 2000 and that such seizures were "not unusual" for him. (*Id*.) Dr. Davis treated plaintiff again on April 6, 2000; his notes describe plaintiff's continued anger and anxiety over the status of his disability benefits. (*Id*. at 379.) Dr. Davis thought plaintiff had a "good argument" because his seizures were caused by his head injury but were not classified as service-connected. (*Id*.) Dr. Davis diagnosed epilepsy and post-traumatic stress disorder, renewed plaintiff's prescriptions, and recommended therapy to decrease plaintiff's anger and anxiety. (*Id*.) On May 22, 2000, plaintiff again was seen at the South Carolina VA and diagnosed with seizure disorder and borderline hypertension. (*Id*. at 356-58.)

2.    Evidence during the Disputed Period

On August 7, 2000, plaintiff told Dr. Davis that he was "really upset because social security took [his] payments away." (Admin. R. at 356.) Plaintiff stated he had been on several seizure medications and that "Dilantin works best" but still did not prevent his seizures from occurring. (*Id*.) Plaintiff said people tell him that when he has a seizure, he passes out, shakes and trembles, and sometimes loses bladder control. (*Id*.) According to plaintiff, he knows when he has had a seizure because of the loss of bladder control and if he is sitting in a chair, he will sometimes "slump to the floor." (*Id*.) Plaintiff stated he had "been told not to drive, not to climb ladders, not to lift more than

about twenty pounds" and that he was "irritable and can't get along with people" and "nervous and can't work." (*Id*.) Dr. Davis noted plaintiff had been prescribed 600 milligrams of Dilantin per day, but had no detectable blood level of that drug. (*Id*.) Dr. Davis ordered several tests and directed plaintiff to continue taking Dilantin and Klonopin. (*Id*.) An EEG dated September 14, 2000 was abnormal, revealing left fronto-temporal dysrhythmia. (*Id*. at 246.)

On October 31, 2000, plaintiff was brought to the emergency room at the Anderson Area Medical Center after a co-worker witnessed him having a seizure. (*Id*. at 197.) A signed invoice dated November 1, 2000 from the Glenn Plumbing Company states that "[plaintiff], an employee of Glenn Plumbing Company was found in our parking lot by one of our employees appearing to be having a seizure. . . . An ambulance was called immediately and he was transported to Anderson Area Medical Center. [Plaintiff] had regained consciousness by the time the ambulance arrived." (*Id*. at 207.) A report from one of the medical center's doctors indicates plaintiff's "Dilantin level [was] sub-therapeutic at .07 with the normal range being 10 to 20." (*Id*. at 197.) Plaintiff was diagnosed with "[s]eizure secondary to sub-therapeutic Dilantin level," given an oral dose of Dilantin, and discharged home. (*Id*.)

Dr. Fessler treated plaintiff at the South Carolina VA on November 21, 2000. (*Id*. at 352-53.) During the visit, plaintiff described being fired by Glenn Plumbing Company and other employers because of his seizures. (*Id*. at 353.) Dr. Fessler noted that Dr. Davis had certified plaintiff as being unable to work on several occasions and that plaintiff's lab reports revealed sub-therapeutic Dilantin levels on July 8, 1999, August 13, 1999, October 12, 1999, and June 1, 2000. (*Id*. at 353-54.) According to the report, plaintiff admitted not taking Dilantin that day because he "had to eat breakfast and come over here." (*Id*. at 353.) Dr. Fessler concluded that "[f]or practical purposes,

it appears that [plaintiff] is unable to work in his usual occupation because of his seizures." (*Id*. at 355.) Dr. Fessler recommended a psychiatric visit and reminded plaintiff not to drive or be at heights above ground. (*Id*.) Dr. Davis saw plaintiff on December 5, 2000, noted an abnormal EEG, and again diagnosed him with grand mal epilepsy and post-traumatic stress disorder. (*Id*. at 351.)

On March 27, 2001, Dr. David Massey, a clinical psychologist, examined plaintiff pursuant to a referral from the Disability Division of the South Carolina Vocational Rehabilitation Department. (*Id*. at 190-92.) According to Dr. Massey, Plaintiff seemed "openly very angry and hostile and on many occasions intimidating." (*Id*. at 190.) Plaintiff said he was upset about losing his disability benefits and thought it obvious he could not work because he had lost twenty-six jobs because of seizures over the last thirty-two years. (*Id*.) Plaintiff denied having problems concentrating and Dr. Massey noted that plaintiff successfully performed several routine concentration exercises. (*Id*.) Plaintiff reported having nightmares and flashbacks in the past, with the most recent flashback occurring about a year or two ago, and admitted being constantly angry. (*Id*.) When questioned about his daily activities, plaintiff reported cooking his own meals, watching television, filling in crossword puzzles, and reading his Bible. (*Id*. at 191.) Plaintiff described going to church every Sunday and every Wednesday night, going to sleep at various times each night, and getting up at approximately five or six each morning. (*Id*.) Dr. Massey noted that plaintiff became belligerent and defensive when answering questions about his activities. (*Id*.) Plaintiff denied ever using alcohol or illegal drugs but admitted smoking a pack and a half of cigarettes per day. (*Id*.)

Dr. Massey diagnosed plaintiff with post-traumatic stress disorder and concluded he was chronically angry and likely depressed, although the doctor found it "very difficult to get more specific information since he was very angry and often noncompliant during the interview." (*Id*.)

In describing plaintiff's ability to work, Dr. Massey reasoned that even if his seizures did not prevent him from working, which they apparently had, plaintiff's anger would likely make it difficult for him to get along with others. (*Id*.)

A "Mental Residual Functional Capacity Assessment" form dated April 5, 2001, describes plaintiff's ability to carry out detailed instructions and to interact appropriately with the general public as moderately limited. (*Id*. at 216-217.) The form also describes plaintiff's ability to carry out his daily activities as mildly restricted, his ability to maintain concentration as mildly restricted, and his ability to function socially as moderately limited. (*Id*. at 230.) Notes from Dr. Davis dated April 5, 2001 indicate plaintiff failed to appear for a scheduled appointment and had not refilled his medications since December 5, 2000. (*Id*. at 351.) A "Physical Residual Functional Capacity Assessment" form completed on April 10, 2001 diagnoses plaintiff with seizure disorder; notes that he suffers from no exertional, postural, manipulative, or communicative limitations; but states he should avoid concentrated exposure to hazards, such as machinery and heights. (*Id*. at 208-215.) The form attributes the sub-therapeutic levels of medication in plaintiff's blood to plaintiff's non-compliance. (*Id*. at 212.)

Dr. Fessler saw plaintiff again at the South Carolina VA on May 25, 2001. (*Id*. at 346.) During the visit, plaintiff reported having two seizures since his last visit, one of which caused him to miss his scheduled appointment on April 5, 2001. (*Id*. at 346; *see id*. at 351.) Plaintiff denied having any other problems or experiencing symptoms of depression and a depression screen performed on him was negative. (*Id*. at 346, 349.) Based on laboratory tests of the Dilantin levels in plaintiff's blood and his failure to refill his prescriptions, Dr. Fessler noted plaintiff's apparent non-compliance with his medication and advised him to take his medications as prescribed. (*Id*.)

Dr. Fessler's notes from plaintiff's next visit on November 29, 2001 indicate plaintiff had last filled his Dilantin prescription on May 25, 2001, and that two refills remained. (*Id*. at 341.) Dr. Fessler reported that plaintiff was presently late on his refill and had previously had undetectable Dilantin levels in his blood despite being prescribed 600 milligrams per day. (*Id*. at 341-42.) When Dr. Fessler questioned plaintiff about taking his medication and refilling it on time, plaintiff became argumentative and eventually requested treatment by another physician. (*Id*.)

On December 3, 2001, Dr. John Simmonds treated plaintiff, who reported having a seizure the previous week despite taking his medication as prescribed. (*Id*. at 339.) When questioned about the previous tests showing sub-therapeutic levels of Dilantin in plaintiff's blood, plaintiff explained that his pharmacy failed to automatically send him his refills as promised. (*Id*.) Dr. Simmonds diagnosed plaintiff with seizure disorder, noted his history of uncertain compliance with medication, renewed his prescriptions, and scheduled a follow-up visit in six months. (*Id*.) Plaintiff arrived at the follow-up visit on June 4, 2002 in a highly agitated mood. (*Id*. at 337.) When Dr. Simmonds examined him, plaintiff was "agitated, crying[, and] distrau[gh]t." (*Id*.) Plaintiff stated he had lost twenty jobs due to his disability, that he had been turned down for disability payments, and that "you have to be a white drug addict to get help. The only way someone can help me is to write a letter to get disability." (*Id*.) The doctor referred plaintiff to the psychiatrist, Dr. Davis, and instructed him to return to the clinic in six months. (*Id*.)

Plaintiff saw Dr. Davis on June 4, 2002, and reiterated his earlier complaints about failing to obtain a service-connected disability for his seizure disorder. (*Id*. at 334.) Dr. Davis noted that plaintiff's seizures were well documented, that he has an abnormal EEG, takes Dilantin, had lost numerous jobs due to his seizure disorder, and had no history of alcohol or drug use. (*Id*. at 335.)

Dr. Davis indicated plaintiff had no personal or family history of seizures prior to his military service and opined that plaintiff's abnormal EEG showing left fronto-dysrhythmia "could have resulted from a contra-coup type injury of the brain" caused by a gunshot wound to the head. (*Id*.) Accordingly, Dr. Davis concluded that plaintiff should be a given a service-connected disability for his seizure disorder. (*Id*.) In Dr. Davis's view, plaintiff's seizure disorder combined with his post-traumatic stress disorder "render him totally and permanently disabled for all employment." (*Id*.) Dr. Davis restarted plaintiff on Klonopin. (*Id*.)

On June 10, 2003, plaintiff presented at the Manhattan VA for medical evaluation. (*Id*. at 312.) Plaintiff described his medical history and his difficulties finding employment. (*Id*.) The attending doctor, Joseph Leung, noted plaintiff became angry and frustrated when discussing his head injury. (*Id*. at 312.) Dr. Leung diagnosed a chronic seizure problem and recommended tests for Dilantin level and a neurology consultation for further evaluation. (*Id*.) Notes from a follow up visit on June 27, 2003, contain lab results showing a Dilantin level of less than .05 in plaintiff's blood. (*Id*. at 314.) During the visit, plaintiff became angry when discussing his condition and the doctor treating him noted he "was enraged and [a] physical exam was not an option." (*Id*.) The doctor prescribed Dilantin and recommended neurologic and psychiatric consultations. (*Id*.)

On July 2, 2003, plaintiff was seen by a neurologist, Dr. Jacqueline Friedman. (*Id*. at 315.) During the consultation, plaintiff reported having seizures approximately every other day and having last had a seizure the day before. (*Id*.) An examination showed plaintiff to have no evidence of thought disorder or disordered affect nor any indication of impaired motor strength, sensation, reflexes, or cranial nerves. (*Id*.) Dr. Friedman diagnosed plaintiff with seizure disorder secondary to a gunshot wound and noted that he "refuses to take additional meds or to change his dilantin dose

despite recurrent seizures and against medical advice." (*Id*.) Dr. Ronald Hanover, a clinical psychologist examined plaintiff on July 10, 2003. (*Id*. at 316.) Plaintiff became "incensed[,] angry[,] loud[,] and enraged" when Dr. Hanover told him that the purpose of the examination was for treatment and not for establishing a service-connected disability. (*Id*. at 316.) After what the doctor described as "a very difficult interview," he had "no doubt" plaintiff suffered from post-traumatic stress disorder and seizure disorder and was extremely upset over what had happened to him. (*Id*.) Dr. Hanover recommended case management to assist with plaintiff's appeal and psychiatric medication to calm plaintiff down. (*Id*.)

3.     Evidence after the Disputed Period

Dr. David Wiley, a psychiatrist, treated plaintiff at the Manhattan VA on September 2, 2003. (Admin. R. at 318.) Plaintiff was angry and agitated as he discussed his treatment history and his efforts to gain disability benefits. (*Id*.) He complained of insomnia, nightmares, and flashbacks of his war experience. (*Id*.) Plaintiff declined psychotropic medication and further medical evaluation. (*Id*.) Dr. Wiley noted plaintiff's condition on discharge was "stable and unchanged." (*Id*.) On October 9, 2003, Dr. Mikhail Presman and Dr. Gregory Bogen saw plaintiff at the Brooklyn VA in order to reevaluate his eligibility for a service connected disability. (*Id*. at 319.) The doctors failed to complete the evaluation because they lacked plaintiff's medical records; they were unaware of a request requiring plaintiff's reevaluation be conducted by two board-certified psychiatrists; and because plaintiff refused to furnish them with the requisite information. (*Id*.) Dr. Presman noted plaintiff "was extremely irritable, hostile at times, [and] paranoid towards VA workers" and that he evidenced flashbacks possibly relating to his post-traumatic stress disorder. (*Id*.)

In a letter dated March 16, 2004, the Department of Veteran Affairs informed plaintiff he was

entitled to full compensation for his service connected disability retroactive to October 31, 2000. (*Id*. at 434-35.) The Department increased plaintiff's compensation from fifty percent because it determined that his post-traumatic stress disorder had worsened. (*Id*. at 435; *see id*. at 389.)

*The ALJ's Decision*

In a written decision dated May 25, 2004, the ALJ concluded plaintiff was not disabled within the meaning of the Act during the disputed period and, therefore, was not entitled to a period of disability and disability insurance benefits for that time but that he had been disabled since September 2, 2003. The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 to reach her conclusion.

At the outset, the ALJ noted that, although plaintiff claimed a disability beginning October 1, 1992, he never appealed to federal district court to reverse the final decision of the Commissioner finding him not disabled from September 1998 through June 24, 2000. Accordingly, the ALJ held the doctrine of *res judicata* required a conclusive finding that plaintiff was not disabled from September 1998 through June 24, 2000 and that the alleged onset date, for purposes of plaintiff's application, was June 25, 2000.

In applying the five-step test, the ALJ resolved step one in plaintiff's favor because he had not performed substantial gainful activity since the alleged onset date. At step two, the ALJ found that plaintiff suffered from one or more "severe" impairments, as defined by the Act. However, the ALJ resolved step three against plaintiff, finding that his impairments, either alone or in combination, were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1[2]. The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ

---

[2]20 C.F.R. pt. 404, subpt. P, app. 1.

concluded that during the disputed period, plaintiff retained the residual functional capacity to perform a wide range of heavy work as set forth in 20 C.F.R. § 404.1567, but that, beginning September 2, 2003, plaintiff's mental impairment became so severe that it prevented him from performing even simple, unskilled work in any exertional category. The ALJ noted the burden then shifted to the Social Security Administration to show plaintiff could perform other work consistent with his age, education and work experience. At step five, the ALJ found plaintiff was an individual of "advanced age" with some education and both skilled and unskilled work experience but that beginning September 2, 2003, his mental impairment so compromised his ability to work that he became unable to perform any work existing in significant numbers in the national economy.

## II.    Discussion

### A.    Standard of Court Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court

for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair

hearing, to make explicit findings, or to have correctly applied the regulations." *Manago v.

Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases). A remand

to the Commissioner is also appropriate "where there are gaps in the administrative record." *Rosa

v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314

(E.D.N.Y. 1997)).

**B.      Standards Governing Evaluation of Disability Claims by ALJ**

An individual is "disabled" under the Act where there is an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The claimant bears

the initial burden of proof of showing disability by presenting "medical signs and findings,

established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other

evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also Carroll v. Sec'y of Health

and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1520, there is a five-step process by which the ALJ determines

disability under the Act. If at any step the ALJ finds that the claimant is either disabled or not, the

inquiry ends. At the first step, the claimant is not disabled if he or she is working and performing

"substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the

claimant has a "severe impairment," without reference to age, education, or work experience.

Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to

do basic work activities."  20 C.F.R. § 404.1520(c).

At the third step, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.  20 C.F.R. § 404.1520(d).  If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five.  20 C.F.R. § 404.1520(e).  In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work."  20 C.F.R. § 404.1520(f).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience; if so, the claimant is not disabled.  20 C.F.R. § 404.1520(g).  The burden of showing that the claimant could perform other work in this final step shifts to the Commissioner.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

### C.    Substantial Evidence Supports the ALJ's Determination that Plaintiff Does Not Have a Listed Impairment

In step three of the five-step test, the ALJ found that plaintiff's disabilities, although severe, failed to qualify as impairments listed in Appendix 1.  Plaintiff disagrees, contending that the gunshot wound he suffered in Vietnam resulted in a *per se* disabling seizure disorder and a *per se* disabling organic mental disorder when evaluated under listings 11.02(A) and 12.02(A) and (B), respectively.

In order for a condition to be considered disabling *per se* under step three, it must satisfy each element set out in the definition of a listed impairment.  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999).  The elements of listing 11.02, or "convulsive epilepsy," include (1) a "detailed description of a typical seizure pattern, including all

associated phenomena"; and (2) seizures "occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02. Section 11.02(A) specifically refers to "daytime episodes" involving "loss of consciousness and convulsive seizures." *Id*. at §11.02(A). The above criteria, however:

> [C]an be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of . . . antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. . . . Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.

20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00(A). Thus, adherence with prescribed medical treatment is an essential element of the medical listing for convulsive epilepsy and, accordingly, its absence prevents a seizure disorder from being considered a listed impairment. *See Castillo v. Barnhart*, No. 01 CIV 9632, 2003 WL 21921269 at *9 (S.D.N.Y. Aug. 11, 2003) ("With respect to a seizure disorder, the elements include, among other things . . . adherence to anticonvulsive drug therapy, confirmed by blood tests . . . [and] the occurrence of seizures at a frequency described in the regulations despite compliance with prescribed drug treatment.")

Throughout the disputed period, plaintiff's doctors prescribed him a daily dose of 600 milligrams of Dilantin to control his seizures. In order to be effective and be considered "therapeutic," Dilantin levels in a patient's blood must measure between 10 and 20. (*See* Admin. R. at 197.) At his hearing, plaintiff conceded that his medication, although insufficient to wholly prevent his seizures, "keeps them under control" by decreasing their frequency and severity. (*Id*. at

51-52.) Despite this admission, the record lacks any indication that plaintiff attempted to comply with his prescribed course of treatment during the disputed period. On multiple occasions throughout the disputed period, tests revealed sub-therapeutic levels of Dilantin. On August 7, 2000, plaintiff had no detectable level of Dilantin in his blood. (*Id*. at 356.) On October 31, 2000, plaintiff's Dilantin level was recorded at .07. (*Id*. at 197.) The "Physical Residual Functional Capacity Assessment Form" completed on April 10, 2001 notes plaintiff's Dilantin levels were sub-therapeutic due to non-compliance. (*Id*. at 212.) On June 27, 2003, plaintiff's Dilantin level was recorded at less than .5. (*Id*. at 312.) No test results contained in the record of this case show plaintiff's Dilantin level falling within the therapeutic range. Furthermore, plaintiff also failed to refill his prescriptions in a timely fashion on more than one occasion. (*Id*. at 341, 349.) Several of plaintiff's care providers opined that his low Dilantin levels and his failure to refill his prescriptions evidenced a conscious refusal to comply with his prescribed treatment. (*Id*. at 212, 315, 339, 349.)

Although the ALJ did not expressly predicate her findings at step three upon plaintiff's non-compliance with his medication, the record clearly would have allowed her to do so. Because a finding of convulsive epilepsy under listing 11.02(A) can be made only when "the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment," the ALJ's determination that plaintiff's seizure disorder fails to meet or exceed the listing is supported by substantial evidence. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00(A).

Plaintiff argues his non-compliance should not support a finding against him at this step because the ALJ failed to inquire whether "justifiable cause" excused him from compliance and because "[t]here is no evidence that if [plaintiff] adhered to his Dilantin prescription he would not have met or equaled the Medical Listing." (Pl.'s Mem. Supp. 15.) These arguments lack merit.

Plaintiff's failure to take his Dilantin as prescribed prevented the ALJ from finding he had a *per se* disabling seizure disorder under listing 11.02, irrespective of justifiable cause. Justifiable cause for refusing treatment generally becomes relevant only in the context of steps four and five of the five-step test, which consider a claimant's actual ability to perform work. *See Grubb v. Apfel*, 98 CIV 9032, 2003 WL 23009266 at * 5 (S.D.N.Y. Dec. 22, 2003). Plaintiff's second point also confuses the analysis; only had he actually been complying with his prescribed course of treatment for at least three months could he claim that his condition qualified as a listed impairment in spite of the treatment. 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02. There is ample evidentiary support for finding plaintiff never complied with his treatment during the disputed period, hence, none is needed to support finding such treatment would have been inadequate.

Plaintiff also claims the ALJ erred in failing to find he had a *per se* disabling organic mental disorder under listing 12.02. Section 12.02 requires, *inter alia*, "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain" and demonstration of "the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.02. The evidence in the record supports finding that plaintiff sustained a brain injury in Vietnam and that he suffers from psychological and behavioral abnormalities; yet section 12.02 requires that the specific organic factor—the brain injury—be etiologically related to the abnormal mental state. The record fails to demonstrate the requisite causal connection. While plaintiff's doctors linked his seizure disorder to his brain injury, there is scant evidence to suggest they similarly connected his psychological and behavioral problems to a specific organic factor. Accordingly, substantial evidence supports the ALJ's conclusion that plaintiff was not *per se* disabled under any of the listings in Appendix 1.

**D.    The ALJ's Determination that Plaintiff Maintained the Residual Functional Capacity to Perform His Past Relevant Work is Not Supported by Substantial Evidence**

The ALJ determined at step four that plaintiff "retained the residual functional capacity to perform heavy work with some non-exertional environmental and mental limitations from June 25, 2000 through September 1, 2003 [and] could have performed his past relevant work as a stock clerk." (Admin. R. at 23.)   In reaching this conclusion, the ALJ determined that plaintiff's allegations of disability were not credible.  Specifically the ALJ found that:

> [P]rior to September 2, 2003, [plaintiff] did not have any physical impairments, other than a seizure disorder, and he was not compliant with taking Dilantin for his seizure disorder.  His records prior to September 2, 2003, also revealed that [he] was no longer having flashbacks or nightmares due to his post traumatic stress disorder and a depression screen performed on him was negative.

(*Id*. at 22.)  The court finds these conclusions unsupported by substantial evidence and is convinced that remand is now necessary because (1) the ALJ failed to explain why the opinions of plaintiff's primary treating source were unpersuasive or how they were contradicted by substantial evidence in the record, and (2) the ALJ appeared to base her decision in part upon plaintiff's failure to take his medication without sufficiently analyzing the cause of, and effect of, such failure.

In determining plaintiff's residual functional capacity during the disputed period, the ALJ considered a variety of evidentiary sources.  Noticeably absent from the ALJ's pool of considered evidence, however, were the diagnoses and reports of Dr. John Davis, who treated plaintiff at least nine times between April 12, 1999 and June 4, 2002,  and Dr. Richard Fessler,[3] who treated plaintiff at least four times between October 12, 1999 and November 21, 2001.  (*Id*. at 334-35, 341-43, 346-49, 351-56, 365-67, 378-79, 388-93.)  No other doctors mentioned in the record treated plaintiff over

---

[3]The ALJ did make note of portions of a report from plaintiff's visit to Dr. Fessler on May 25, 2001, indicating that plaintiff did not exhibit symptoms of depression.  (Admin. R. at 21.)

a longer span of time and no single doctor saw plaintiff more often than did Dr. Davis.

A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)). When a treating source's opinion is not given *controlling* weight, the proper weight accorded depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id*. There are, however, certain decisions reserved to the Commissioner. Such decisions include the determination that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Dr. Davis concluded on June 4, 2002 that plaintiff's seizure disorder and post-traumatic stress disorder "render[ed] him totally and permanently disabled for all employment." (Admin. R. at 335.) Similarly, Dr. Fessler concluded on November 21, 2000 that "[f]or practical purposes, it appears that [plaintiff] is unable to work in his usual occupation because of his seizures." (*Id*. at 355.) Although the ALJ was entitled to discount the doctors' conclusory assertions of disability, the

diagnoses that led to those assertions cannot similarly be ignored. *See Peralta v. Barnhart*, 04 CV 4557, 2005 WL 1527669 at *10 (E.D.N.Y. 2005) ("An ALJ is not required to give controlling weight to a treating physician's opinion that a claimant is disabled or unable to work. . . . Nevertheless, an ALJ must review 'all of the medical findings and other evidence that support a medical source's statement that [a claimant] is disabled.'") (quoting 20 C.F.R. § 404.1527(e)(1)).

Specifically, Dr. Davis and Dr. Fessler consistently diagnosed plaintiff with seizure disorder and post-traumatic stress disorder during the disputed period. They both believed these conditions were severe enough to prevent plaintiff from engaging in the work reasonably available to him. Neither party contests that both Dr. Davis and Dr. Fessler qualify as "treating sources" and there is no indication that the treatment techniques they used were medically unacceptable. Yet not only did the ALJ fail to assign controlling or great weight to these opinions, she failed even to analyze them. The ALJ did point to some scattered portions of the record tending to contradict the opinions of Dr. Davis and Dr. Fessler, but she in no way explained how or why the former evidence outweighed the latter. (*See* Admin. R. at 21-22.) This error requires remand. *Rosato v. Barnhart*, 352 F. Supp. 2d 386, 396 (E.D.N.Y. 2005) (holding that remand was required where ALJ failed to take into account opinion of a treating physician who was the first to diagnose plaintiff and who referred plaintiff to specialist); *see also Pogozelski v. Barnhart*, 03 CV 2914, 2004 WL 1146059 *12 (E.D.N.Y. May 19, 2004) ("[T]he opinion of a treating physician, should have been accorded controlling weight, or if not, the ALJ was still required to apply the factors specified in the regulations concerning treating physicians . . . to determine the degree of weight it deserved. The failure to do [so] requires remand"). The Second Circuit has emphasized that courts should "not hesitate to remand when . . . encounter[ing] opinions from ALJ's that do not comprehensively set forth reasons for the weight

assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

On remand the ALJ also should explore further the issue of whether plaintiff's failure to take his medication prevents him from claiming disability during the disputed period. Given the evidentiary record, the ALJ acted well within her discretion when she discredited plaintiff's testimony and found he was not taking his Dilantin as prescribed. Nevertheless, the analysis should not have ended there. It is unclear from the decision whether the ALJ believed plaintiff's seizure disorder to be a remediable impairment that plaintiff failed to remedy without justifiable cause or whether the ALJ simply believed the seizure disorder was not severe enough to be considered disabling. *See Benedict v. Heckler*, 593 F. Supp. 755, 759 (E.D.N.Y. 1984) (noting that in order to deny benefits based on a claimant's failure to follow prescribed treatment, the ALJ must find (1) that the physician prescribed treatment; (2) that such treatment must restore claimant's ability to work; and (3) that claimant must have no justifiable cause to refuse treatment). On remand, if the ALJ determines that plaintiff should be denied benefits because of his refusal to take his medication, these issues must be fleshed out.

## III.    Conclusion

The Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id.*

Accordingly, defendant's motion for judgment on the pleadings and plaintiff's cross-motion for judgment on the pleadings are denied and this matter is remanded to the Commissioner for further evidentiary proceedings consistent with this Memorandum and Order, pursuant to the fourth sentence of 42 U.S.C. § 405(g). To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be completed within sixty days of the issuance of the order, i.e., by November 27, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004) (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district court). "[I]f these deadlines are not observed, a calculation of benefits owed [to plaintiff, Darrell Bolden] must be made immediately." *Id.*

SO ORDERED.

DATED:     Brooklyn, New York
                September 28, 2007

                                        _____/s/_____
                                        DORA L. IRIZARRY
                                        United States District Judge